**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | | |
|---|---|---|
| GOMEZ PACKAGING CORP., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | |
| | ) | |
| SMITH TERMINAL WAREHOUSE CO., | ) | JURY TRIAL DEMANDED |
| INC. AND FRANK FUTERNICK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**COMPLAINT**

Plaintiff Gomez Packaging Corp. ("Gomez") complains against defendants Smith Terminal Warehouse Co., Inc. ("Smith") and Frank Futernick ("Futernick") as follows:

**PARTIES**

1. Gomez is a New Jersey corporation with its principal place of business in Paterson, Passaic County, New Jersey. Gomez is in the business of manufacturing sterile and non-sterile hygiene and health care products ordered by its customers and/or for sale to the domestic wholesale and retail market.

2. Smith is a Florida corporation with a principal place of business in Miami, Miami-Dade County, Florida. Smith is in the business of warehousing materials and goods in its Miami warehouse.

3. Futernick is an individual who resides in Florida at an address not known to Gomez. Upon information and belief, Futernick's residence address is 325 Pacific Road, Key Biscayne, Miami-Dade County, Florida 33149. Upon information and belief, at all relevant times, Futernick was a director and officer in Smith and had a business

1

address care of Smith's principal place of business in Miami, Miami-Dade County, Florida.

4. Crown Consumer Brands, LLC ("Crown"), an affiliate of Gomez, is not a party, but has interests in the outcome of this proceeding that are being represented by and prosecuted by Gomez. Gomez entered into a bailment with Smith on its own behalf and on behalf of Crown. Crown is a Delaware limited liability company. Crown's members include Christopher Calise, a citizen of New York, Daniel Solomon, a citizen of New Jersey, and Yorky Gomez, a citizen of New Jersey.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332(a). The Plaintiff is a citizen of a different state than the Defendants, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6. This Court has personal jurisdiction over the Defendants. Both of the Defendants committed the acts complained of in this District; Defendant Smith is a resident of this District; Defendant Futernick works in this District; upon information and belief, Defendant Futernick is a resident of this District; and the Defendants harmed the Plaintiff in this District, among other places.

7. Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391(a) and (c). Defendant Smith resides in this District; Defendant Futernick, upon information and belief, is a resident of this district; a substantial part of the events giving rise to this lawsuit occurred in this District; and the Defendants are subject to personal jurisdiction in this District.

**FACTUAL BACKGROUND**

8.    Gomez and Crown are in the business of manufacturing hygiene and health care products, including sterile products, for their end-use customers.

9.    Gomez and Crown purchase raw materials in the United States (or in some cases, receive raw materials provided to them by their customers), store the goods in a Miami warehouse, and ship their raw materials off-shore for manufacture into finished goods. Once manufactured, the finished goods are shipped back to Crown and Gomez in the United States.

10.   It was critical to Gomez and Crown for the Miami warehouse selected for storage of their raw materials and finished goods to be a "food grade" warehouse. Among other things, federal regulations require warehouses storing food to be free of pests or other similar contaminants.

11.   On or around March 3, 2009, Gomez's Daniel Solomon ("Solomon") met with Futernick at Futernick's offices. Futernick informed Solomon that Smith was a family-owned company of Futernick's. Solomon informed Futernick that he was interested in identifying a warehouse in Miami in which to store hygiene and health care products, including sterile products. Accordingly, Solomon asked Futernick about the pest control procedures at the Smith Miami warehouse. Futernick represented to Solomon that Smith's Miami warehouse was a food grade warehouse and that Smith had strict pest control policies in place for the warehouse.

12.   In reliance upon Futernick's representations, Gomez determined to warehouse its raw materials (prior to production off-shore) and finished goods (after production off-shore) at Smith's Miami warehouse.

13. At all relevant times, Gomez has warehoused goods with Smith, on its own behalf and on behalf of Crown.

14. At all relevant times, neither Gomez nor Crown has stored raw material or finished product in any Miami location other than in Smith's warehouse located at 10800 NW 97th Street, Miami, Florida.

15. Gomez's engagement of Smith as warehouseman in each and every instance was evidenced by writings titled "non-negotiable warehouse receipt and invoice." Copies of warehouse receipts which identify the product at issue are attached jointly as composite **Exhibit A**.

16. Although some of the warehouse receipts purported to be subject to terms and conditions on the reverse side, none of the receipts presented by Smith to Gomez ever had a second side.

17. At no time did Smith communicate to Gomez any conditions, restrictions or limitations upon its duties under law and/or under contract as a warehouseman.

18. In December 2009, Crown transported to the Smith Miami warehouse well over 500,000 linear yards of bristle material and neck-bonded laminate material (together referred to as the "Toothbrush Raw Material") for use in the manufacture of toothbrushes.

19. The Toothbrush Raw Material for manufacture of the toothbrushes must remain in a controlled environment.

20. In addition, Kimberly-Clark Corporation ("K-C") provided to Gomez stretch bonded laminate bandage material (the "Bandage Raw Material"), for use by Gomez in the manufacture of bandages for K-C's end-use customer, Johnson & Johnson ("J&J). The Bandage Raw Material was stored as well in the Smith Miami warehouse.

21. Gomez used the Bandage Raw Material to manufacture bandages off-shore.

22. The manufactured bandages from off-shore were reshipped to Gomez, care of the Smith Miami warehouse.

23. Shortly after their arrival back at the Smith Miami warehouse, the bandages were shipped to Gomez's New Jersey warehouse, where they were re-palletized.

24. On various dates in mid and late 2010, Berkeley Contract Packaging, LLC ("Berkeley"), a vendor of J&J, took possession of bandages, and transported them from Gomez's New Jersey warehouse to Berkeley's facility in New Jersey. On or about November 22, 2010, Berkeley observed insects inside one of the Gomez bandage shipments.

25. On December 7, 2010, J&J informed K-C by e-mail that Berkeley had identified beetles in the Gomez bandage lots. J&J had concluded, based upon the condition and location of the dead insects and based also on a report for Berkeley by Western Pest Services of Mountainside, New Jersey, that the infestation had occurred prior to their pick-up by Berkeley. J&J requested that K-C initiate an investigation into the situation.

26. Also on December 7, 2010, K-C transmitted the J&J e-mail to Gomez. This was the first information Gomez ever received that its bandage product had been infested.

27. On December 8, 2010, Gomez had Orkin Pest Control ("Orkin") inspect its off-shore manufacturing facilities. Orkin determined that there was no beetle

infestation, although Orkin did state that the raw material (which had been transported offshore from the Smith Miami warehouse) inspected did contain some <u>dead</u> beetles.

28. On December 10, 2010, Gomez e-mailed Futernick, among others, following up on an earlier telephone conversation, stating:

> ". . . you need to conduct a formal pest control inspection on the whole warehouse ASAP, as that drugstore beetles were found inside our product. This is the second shipment that drugstore beetles were found in our product. This inspection report is to be part of our investigation report and needs to be performed immediately."

29. On December 13, 2010, Futernick responded to Gomez as follows:

> "I am sorry for any trouble you are experiencing from our warehouse. We have performed our own inspection and see no visible signs of any infestation. We have increased our weekly fumigation to twice weekly to ensure that we don't have a problem. . . ."

30. Gomez launched an investigation of its own facilities as well. That investigation determined that there was an absence of any infestation of beetles during the production process or during the shipping of the finished goods to the Smith Miami warehouse.

31. Notwithstanding, and in an abundance of caution -- especially given that Smith had informed Gomez that the Miami warehouse was not the source of any infestation -- Gomez incurred the expense of fumigating its entire off-shore production facility. On December 28, Orkin reported that following the fumigation, <u>no</u> drugstore beetles were discovered.

32. K-C thereafter instituted a rigorous inspection protocol of other shipments of Gomez's finished bandage product that bypassed the Miami warehouse en route to

6

New Jersey. That inspection was carried out at significant cost to Gomez. It revealed no infestation.

33. K-C also mandated to Gomez that all Gomez bandage product arriving from off-shore be sent directly to New Jersey and be subjected to rigorous and expensive inspection protocols. Gomez complied with its client's directive at Gomez's expense.

34. Futernick's December 13, 2010 statements to Gomez, reiterated thereafter on several occasions, to the effect that the Smith Miami warehouse was not the source of any infestation, were incorrect when made. To the contrary, the only source of infestation was the Miami warehouse.

35. In reliance on Futernick's assurances that Smith's Miami warehouse was food grade and pest free, Futernick's representations that he would investigate whether Smith's Miami warehouse had any insect infestation, and Futernick's statements that the Smith Miami warehouse had no infestation, Gomez (and Crown) did not initiate a separate and/or independent investigation into the conditions at the Smith Miami warehouse.

36. At all relevant times, Gomez was aware that Smith's various customers stored raw materials and foodstuffs at the Smith Miami warehouse -- products for which insect infestation would be disastrous.

37. On or about March 8, 2011, dead and live beetles were discovered by Gomez in a shipment of bandages from the Smith Miami warehouse.

38. Upon inquiry of Smith, Smith continued to maintain that it had no infestation at the Smith Miami warehouse.

39. Gomez again retained Orkin to advise on recommended protocols, and on Orkin's advice, Gomez closed its off-shore production facility for three days and fumigated the entire facility. Following the fumigation, on or about March 14, 2011, Orkin inspected the Gomez off-shore facility to ascertain that there was no infestation there.

40. Also on March 14, 2011, Gomez representatives travelled to Miami to conduct a personal inspection of the Smith Miami warehouse. There, they discovered dead and live insects, including beetles, in various materials stored there.

41. Gomez requested that Smith tender to it pest control reports for the Smith warehouse. In response, Smith tendered only reports from February and March, and neither of those reports indicate whether or not there was any insect infestation at the Smith warehouse premises.

42. The insect infestation throughout the Smith warehouse was plain and clear to the naked eye. Any reasonable person, and every reasonable warehouseman, would have been aware from a walk-through of the Smith warehouse that the Smith warehouse was infested with insects, including beetles.

43. As of March 14, 2011, the Smith Miami warehouse contained raw materials and foodstuffs, among other things.

44. As of the March 14, 2011 inspection, the tone of the Smith personnel at the Miami warehouse changed, such that they no longer denied that the Miami warehouse was infested.

45. At no time, however, did Smith inform Gomez that its Miami warehouse was infested with insects, including beetles.

46. Instead, Smith had continued to accept Gomez's goods into its warehouse, and continued to invoice Gomez for warehousing services provided to Gomez and, through Gomez, to Crown.

47. March 14, 2011 was the first time that Gomez and Crown became aware that the Smith warehouse was infested with insects. Because the Crown Toothbrush Raw Material had to be maintained in a controlled environment, by the time of the discovery of infestation, all of Crown's raw material in the Smith warehouse was rendered worthless and a total loss.

48. Gomez's Bandage Raw Material in the Smith Miami warehouse was sent off-shore for fumigation by Gomez at its own expense.

49. Neither Gomez nor Crown have sent any raw material or finished goods to the Smith Miami warehouse since March 14, 2011.

50. As a result of the infestation, Gomez had to engage a third party to inspect all of its bandages for any sign of insects, at its own expense.

51. As a result of the infestation, Gomez has suffered a loss of goodwill with K-C.

52. In addition, K-C has demanded payment from Gomez of more than $327,000 for damages it allegedly incurred caused by the infestation.

53. Prior to March 14, 2011, Smith informed Gomez of Smith's intent to shutter its Miami warehouse.

54. As a result of Smith's acts and omissions, Gomez and Crown were harmed significantly, each in an amount in excess of $75,000, exclusive of attorneys' fees, interest and court costs.

55. Specifically, Gomez has incurred hundreds of thousands of dollars of damage for damaged product, inspection, fumigation and related costs, in addition to damage to good will.

56. Specifically, Crown has incurred hundreds of thousands of dollars of damage for damaged product, in addition to damage to good will.

57. Furthermore, Gomez and Crown continue to incur damages associated with the storage and transportation of their raw materials and finished goods damaged by the Smith Miami warehouse insect infestation.

## FIRST CLAIM FOR RELIEF
(Breach of Bailment against Defendant Smith)

58. Gomez incorporates the allegations in paragraphs 1 through 57 as if fully set forth herein.

59. At all relevant times, Smith was a warehouseman engaged in the business of storing goods for hire, and the Smith Miami warehouse was a warehouse, as defined and governed by F.S. § 677.

60. As warehouseman for the goods of Gomez and Crown, Smith was responsible to comply with F.S. § 677, including to exercise care with regard to the goods that a reasonably careful person would exercise under similar circumstances.

61. Gomez delivered its raw materials and finished goods, and the raw materials of Crown, to Smith in good condition, free of any insect infestation.

62. A reasonable warehouseman would have taken steps to ensure that the Smith Miami warehouse was insect free, especially given that it purportedly was a food grade warehouse.

63. Smith failed to carry out its bailment obligations to Gomez with due care, and permitted insects to infest its Miami warehouse.

64. The goods of Gomez and Crown were damaged while in the care of Smith.

65. By failing to maintain an insect-free warehouse, Smith breached its bailment obligations to Gomez.

66. Smith's breaches damaged Gomez and Crown, each in an amount exceeding $75,000.00 exclusive of interest, attorneys' fees and court costs.

## SECOND CLAIM FOR RELIEF
(Negligence against Defendant Smith)

67. Gomez incorporates the allegations in paragraphs 1 through 57 as if fully set forth herein.

68. When informed by Gomez in December 2010 that insects had been discovered in product that had been at the Smith Miami warehouse, Smith undertook a duty to investigate whether there was an insect infestation at the Smith Miami warehouse.

69. Once Smith undertook a duty to investigate, it was obligated to perform that duty in a reasonable and non-negligent way.

70. Smith breached its duty by failing to properly and completely investigate whether the Smith Miami warehouse was infested.

71. Had Smith properly investigated the condition of the Smith Miami warehouse, it would have discovered an insect infestation in December 2010, and at any rate, prior to March 2011.

72. Further, in December 2010, when Smith undertook to investigate the condition of the Smith Miami warehouse, it undertook a duty to properly inform Gomez of the condition of the Smith Miami warehouse.

73. Smith breached its duty by failing to inform Gomez that the Smith Miami warehouse was, in fact, infested -- a condition that was readily apparent to anyone making an inspection of that premises.

74. Gomez, which at all times had its operations in New Jersey, reasonably relied upon Smith to advise Gomez concerning the condition of the Smith Miami warehouse.

75. Smith either knew or should have known that the Smith Miami warehouse was infested with insects, or failed to ascertain whether the Smith Miami warehouse was infested, and failed to advise Gomez, as it had undertaken to do.

76. In reliance upon the false assurances of Smith that the Smith Miami warehouse was not infested, Gomez continued to transport finished goods into and out of the Smith Miami warehouse between December 2010 and March 2011.

77. In reliance upon the false assurances of Smith that the Smith Miami warehouse was not infested, Crown continued to store Toothbrush Raw Materials at the Smith Miami warehouse between December 2010 and March 2011.

78. Gomez and Crown were damaged by the negligence of Smith. The raw material and finished product sent to and stored at the Smith Miami warehouse between December 2010 and March 2011 was damaged and/or rendered valueless.

79. The negligence of Smith damaged Gomez and Crown, each in an amount exceeding $75,000.00 exclusive of interest, attorneys' fees and court costs.

### THIRD CLAIM FOR RELIEF
(Negligent Misrepresentation against Smith and Futernick)

80. Gomez incorporates the allegations in paragraphs 1 through 57 as if fully set forth herein.

81. When informed by Gomez in December 2010 that insects had been discovered in product that had been at the Smith Miami warehouse, Smith, and Futernick in his individual capacity, informed Gomez that they would inspect the Smith Miami warehouse and inform Gomez of the results of the inspection.

82. Thereafter, Smith and Futernick informed Gomez that the Smith Miami warehouse was not infested.

83. Those representations were false when made.

84. At the time that they made the representations, Smith and Futernick knew or should have know that the Smith Miami warehouse was infested with insects or made the representation without knowledge of the actual condition of the Smith Miami warehouse.

85. Smith and Futernick intended for Gomez to rely upon their representations of non-infestation so that Gomez would continue to store raw materials and finished goods at the Smith Miami warehouse.

86. Gomez, which at all times had its operations in New Jersey, reasonably relied upon Smith and Futernick to advise Gomez concerning the condition of the Smith Miami warehouse.

87. Indeed, it was reasonable for Gomez to have relied upon the representations of Smith and Futernick because at the outset of the parties' relationship, Futernick had personally assured Gomez that the Smith Miami warehouse was insect-free and food-grade.

88. In reliance upon the false assurances of Smith and Futernick that the Smith Miami warehouse was not infested, Gomez and Crown continued to transport and store

raw materials and finished goods in the Smith Miami warehouse between December 2010 and March 2011.

89. Gomez was damaged by relying upon the false representations of Smith and Futernick. The raw material and finished product sent to and stored at the Smith Miami warehouse between December 2010 and March 2011 were damaged and/or rendered valueless.

90. As a result, Smith and Futernick damaged Gomez and Crown, each in an amount exceeding $75,000.00 exclusive of interest, attorneys' fees and court costs.

**FOURTH CLAIM FOR RELIEF**
(Negligent Misrepresentation against Smith and Futernick)

91. Gomez incorporates the allegations in paragraphs 1 through 57 as if fully set forth herein.

92. When informed by Gomez in December 2010 that insects had been discovered in product that had been at the Smith Miami warehouse, Smith, and Futernick in his individual capacity, informed Gomez that they would inspect the Smith Miami warehouse and inform Gomez of the results of the inspection.

93. Throughout the period December 2010 until March 2011, Smith and Futernick omitted to inform Gomez that the Smith Miami warehouse was infested.

94. Even had Smith and Futernick somehow not been aware in December 2010 that the Smith Miami warehouse was infested with insects, they knew or should have known that prior to March 2011.

95. Having encouraged Gomez's reliance upon their initial representation that the Smith Miami warehouse was not infested (and upon Futernick's representation at the outset of the parties' relationship that the Smith Miami warehouse was insect-free and

food-grade), Smith and Futernick were obligated to inform Gomez that the Smith Miami warehouse was infested with insects once they became aware of that fact.

96. Smith and Futernick intended for Gomez to rely upon their silence when they failed to inform Gomez of the insect infestation at the Miami warehouse, so that Gomez would continue to store raw materials and finished goods at the Smith Miami warehouse.

97. Gomez relied upon the absence of any such representation in continuing to transport both raw materials and finished goods into and out of the Smith Miami warehouse between December 2010 and March 2011.

98. Gomez was damaged by the omissions of Smith and Futernick. The raw material and finished product sent to and stored at the Smith Miami warehouse between December 2010 and March 2011 were damaged and/or rendered valueless.

99. As a result, Smith and Futernick damaged Gomez and Crown, each in an amount exceeding $75,000.00 exclusive of interest, attorneys' fees and court costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gomez respectfully prays that the Court grant the following relief:

A. Granting an award of damages in excess of $75,000 in compensation for the losses incurred by each of Gomez and Crown;

B. Granting an award of interest, costs and attorneys' fees incurred by Plaintiff in prosecuting this action; and

      C.      Granting all other relief to which Plaintiff is entitled.

DATED:  June 2, 2011.

                                        Respectfully Submitted,

                                        s/Daniel B. Rosenthal_____
                                        NED R. NASHBAN
                                        Florida Bar No.:  717230
                                        nashbann@gtlaw.com
                                        DANIEL B. ROSENTHAL
                                        Florida Bar No.:  711934
                                        rosenthald@gtlaw.com
                                        GREENBERG TRAURIG, P.A.
                                        5100 Town Center Circle,
                                        Suite 400
                                        Boca Raton, FL  33486
                                        Telephone:     561-955-7600
                                        Facsimile:     561-338-7099