## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 11-21992-CIV-ALTONAGA/Simonton

**GOMEZ PACKAGING CORP.**,

      Plaintiff,

vs.

**SMITH TERMINAL WAREHOUSE
CO., INC.**, *et al.*,

      Defendants.

_____/

### ORDER

**THIS CAUSE** comes before the Court upon Defendants, Smith Terminal Warehouse Co., Inc. ("Smith") and Frank Futernick's ("Futernick['s]") Motion to Dismiss Amended Complaint ("Motion") [ECF No. 44], filed on October 13, 2011.  Plaintiff, Gomez Packaging Corp. ("Gomez"), filed a Complaint [ECF No. 1] on June 2, 2011, asserting four claims — breach of bailment against Smith, negligence against Smith, and two claims of negligent misrepresentation, each against both Smith and Futernick.  Defendants filed a Motion to Dismiss Complaint and Alternative Motion for More Definite Statement [ECF No. 22] on July 25, 2011.  Defendants sought dismissal of the Complaint under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(7), or alternatively a more definite statement of Plaintiff's claims under Rule 12(e).  The Court issued an Order ("September 12 Order") [ECF No. 36] granting Defendants' motion in part, with leave to amend the Complaint.  Plaintiff filed an Amended Complaint [ECF No. 38] on September 23, 2011, and Defendants bring the instant Motion seeking to dismiss the Amended Complaint pursuant to Rules 12(b)(6), 12(b)(7), and 19.  (*See* Mot. 1).  Plaintiff filed a Response to the Motion ("Response") [ECF No. 51] on October 31, 2011.  Defendants filed a Reply [ECF No. 56] on November 10, 2011.  The Court has carefully considered the parties'

written submissions and the applicable law.

# I. BACKGROUND[1]

Gomez, a New Jersey corporation, is in the business of manufacturing sterile and non-sterile hygiene and health care products ordered by customers and for sale in the retail and wholesale market. (*See* Am. Compl. ¶ 1). Smith, a Florida corporation, is in the business of warehousing materials and goods in a warehouse in Miami. (*See id.* ¶ 2). Futernick, a Florida resident, was at all relevant times a director and officer in Smith and had a business address care of Smith's principal place of business in Miami. (*See id.* ¶ 3). Crown Consumer Brands, LLC ("Crown"), is an affiliate of Gomez whose interests in the outcome of this proceeding are represented and prosecuted by Gomez. (*See id.* ¶ 4). Crown, like Gomez, is in the business of manufacturing hygiene and health care products, including sterile products, for end-use customers. (*See id.* ¶ 8).

Gomez and Crown purchase raw materials in the United States or receive them from customers, store them in a Miami warehouse, and ship them off-shore for manufacture into finished goods. (*See id.* ¶ 9). Once manufactured, the finished goods are shipped back to Crown and Gomez. (*See id.*). It is critical for the Miami warehouse to be a "food grade" warehouse. (*Id.* ¶ 10). Federal regulations require such warehouses to be free of pests or other contaminants. (*See id.*).

On March 3, 2009, Gomez's Daniel Solomon ("Solomon") met with Futernick at the latter's office. (*See id.* ¶ 11). Solomon told Futernick he was interested in identifying a Miami

---

[1]   The facts are taken from the Amended Complaint and are presented in the light most favorable to Plaintiff.

Case No. 11-21992-CIV-ALTONAGA/Simonton

warehouse to store health and hygiene products, including sterile products. (*See id.*). Solomon asked Futernick about Smith's pest control procedures, and Futernick represented that Smith's Miami warehouse was food-grade, and Smith had strict pest control policies in place. (*See id.*). In reliance on Futernick's statements, Gomez decided to store raw materials and finished goods at Smith's warehouse in Miami, both before and after off-shore manufacturing and production. (*See id.* ¶ 12). At all relevant times, Gomez has warehoused goods with Smith on behalf of itself and Crown, and neither Gomez nor Crown has warehoused goods in any Miami location other than Smith's warehouse. (*See id.* ¶¶ 13–14).

Each instance in which Gomez employed Smith's warehouse for storage was documented in a "non-negotiable warehouse receipt and invoice" ("Bailment Receipt(s)"). (*Id.* ¶ 15). Although some receipts contained language on the front referencing terms and conditions on the reverse side, all the receipts Gomez received from Smith were blank on the reverse side. (*See id.* ¶ 16). Smith did not otherwise inform Gomez of any conditions, restrictions or limitations to which Defendants' performance was subject. (*See id.* ¶ 17).

In December 2009, Crown transported to Smith's Miami warehouse over 500,000 linear yards of bristle and neck-bonded laminate material ("Toothbrush Raw Material") for use in the manufacture of toothbrushes. (*See id.* ¶ 18). The Toothbrush Raw Material consisted of 149 slits of light blue material, 32 slits of dark blue material, and 102 slits of white material. (*See id.* ¶ 19). At some point, Kimberly-Clark Corporation ("K-C") also provided stretch bonded laminate bandage raw materials ("Bandage Raw Material") to Gomez to manufacture for K-C's end-use customer Johnson & Johnson ("J&J"). (*See id.* ¶ 21). The Bandage Raw Material was also stored at Smith's Miami warehouse. (*See id.*). The manufactured bandages stored at

3

Case No. 11-21992-CIV-ALTONAGA/Simonton

Smith's warehouse consisted of 356 cases of 1-inch bandages. (*See id*. ¶ 24). Gomez used the Bandage Raw Material to manufacture bandages off-shore, which were re-shipped care of the Smith Miami warehouse to Gomez's New Jersey warehouse, where they were re-palletized. (*See id*. ¶¶ 22–23, 25).

On various dates in mid to late 2010, Berkeley Contract Packaging, LLC ("Berkeley"), a vendor for J&J, transported bandages from Gomez's New Jersey warehouse to Berkeley's New Jersey facility. (*See id*. ¶ 26). On November 22, 2010, Berkeley observed insects inside one of Gomez's shipments. (*See id*.). On December 7, 2010, J&J informed K-C by e-mail of this fact and concluded, based on the condition and location of the beetles and on a report for Berkeley by a pest service company, that the infestation occurred prior to Berkeley's pick-up. (*See id*. ¶ 27). J&J asked K-C to initiate an investigation. (*See id*.). Also on December 7, K-C forwarded the e-mail to Gomez, alerting Gomez for the first time that its product was infested. (*See id*. ¶ 28).

On December 8, 2010, Gomez had Orkin Pest Control ("Orkin") inspect its off-shore facilities. (*See id*. ¶ 29). Orkin found there was no infestation there, although raw material that had been transported from Smith's warehouse did contain dead beetles. (*See id*.). On December 10, 2010, Gomez e-mailed Futernick requesting "a formal pest control inspection" of the Miami warehouse "ASAP." (*Id*. ¶ 30). On December 13, 2010, Futernick responded, saying Smith had performed its own inspection and seen "no visible signs of any infestation," but that it increased the weekly fumigation to twice weekly "to ensure [Smith does not] have a problem." (*Id*. ¶ 31).

Gomez launched an investigation of its own facilities, which yielded the conclusion that there was no pest infestation during production or shipping of goods to Miami. (*See id*. ¶ 32). Nevertheless, in an abundance of caution and in reliance on Smith's representations, Gomez had

4

Case No. 11-21992-CIV-ALTONAGA/Simonton

its entire off-shore facility fumigated in December 2010.  (*See id.* ¶ 33).  On December 28, Orkin reported that following fumigation no beetles were discovered.  (*See id.*).  K-C's inspection of finished products *not* stored in Smith's Miami warehouse, carried out at significant expense to Gomez, revealed no infestation.  (*See id.* ¶ 34).  K-C also mandated that all Gomez bandage product arriving from off-shore be sent directly to New Jersey and subject to expensive inspection protocols, which Gomez did at its own expense.  (*See id.* ¶ 35).  Futernick's December 13, 2010 statements to Gomez were reiterated orally several times by Smith's Nelson Romero ("Romero") to Gomez's Jonathan Landes ("Landes") and Carla Bueno ("Bueno"), to the effect that Smith's warehouse was not a source of infestation.  (*See id.* ¶ 36).  In reliance on Futernick and Smith's representations, Gomez and Crown did not initiate a separate investigation into Smith's Miami warehouse.  (*See id.* ¶ 37).  At all relevant times, Gomez was aware Smith's customers stored raw materials and foodstuffs at Smith's warehouse.  (*See id.* ¶ 38).

On March 8, 2011, Gomez discovered dead and live beetles in a shipment of bandages from Smith's Miami warehouse.  (*See id.* ¶ 39).  When inquiries were made of Smith, Smith maintained it had no infestation.  (*See id.* ¶ 40).  Gomez retained Orkin again, and on Orkin's advice Gomez closed its off-shore facility for three days and fumigated it.  (*See id.* ¶ 41).  Following the fumigation, on March 14, 2011, Orkin inspected the off-shore facility and determined there was no infestation.  (*See id.*).  Also on March 14, 2011, Gomez representatives personally inspected the Smith warehouse, where they discovered dead and live insects, including beetles, in various materials stored there.  (*See id.* ¶ 42).  Gomez requested that Smith tender its pest control reports for the warehouse.  (*See id.* ¶ 43).  In response, Smith tendered reports from February and March, neither of which indicated whether there was an infestation.

Case No. 11-21992-CIV-ALTONAGA/Simonton

(*See id*.).  The infestation at the Smith warehouse was "plain and clear to the naked eye."  (*Id*. ¶ 44).

As of the March 14 inspection, Smith personnel no longer denied their warehouse was infested.  (*See id*. ¶ 46).  At no time, however, did Smith inform Gomez its warehouse was infested; rather Smith continued to accept Gomez's goods into its warehouse and invoice Gomez for warehousing services.  (*See id*. ¶¶ 47–48).  The March 14 inspection was the first time Gomez and Crown were aware of insect infestation at Smith's Miami warehouse.  (*See id*. ¶ 49).  By that date, all of Crown's raw material stored in Smith's warehouse was rendered worthless and a total loss.  (*See id*.).  Gomez's Bandage Raw Material in the Smith warehouse was sent for fumigation off-shore at Gomez's expense.  (*See id*. ¶ 50).

Neither Gomez nor Crown has sent any raw material or finished goods to Smith's Miami warehouse since March 14, 2011.  (*See id*. ¶ 51).  As a result of the infestation, Gomez had to engage a third party to inspect all its bandages for insects, at its own expense.  (*See id*. ¶ 52).  The infestation damaged property other than just the manufactured bandages stored at Smith's Miami warehouse.  (*See id*. ¶ 53).  In particular, at least 260 cases of Gomez's manufactured bandages that had been transported and stored by Berkeley were also damaged from cross-contamination.  (*See id*. ¶ 54).  Gomez also suffered a loss of goodwill with K-C.  (*See id*. ¶ 55).  K-C has also demanded payment from Gomez of more than $327,000 for damages allegedly incurred from the infestation.  (*See id*. ¶ 56).

As a result of Smith's acts and omissions, Gomez alleges damage to itself and Crown of "hundreds of thousands of dollars" for damaged product, inspection, fumigation, and related costs, as well as good will.  (*See id*. ¶¶ 59–60).  Gomez and Crown further continue to incur

6

Case No. 11-21992-CIV-ALTONAGA/Simonton

damages associated with the storage and transport of their raw materials and finished goods damaged by the infestation.  (*See id.* ¶ 61).

In the Amended Complaint, Gomez asserts four claims — breach of bailment against Smith, negligence against Smith, and two claims of negligent misrepresentation, each against both Smith and Futernick.  (*See id.* ¶¶ 62–108).  Defendants move to dismiss the Amended Complaint under Federal Rules of Civil Procedure 12(b)(6), 12(b)(7), and 19.  (*See* Mot. 1).

## II.  LEGAL STANDARD

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

Rules 12(b)(7) allows a party to move for dismissal for "failure to join a party under Rule 19."  FED. R. CIV. P. 12(b)(7).  Rule 19 requires the joinder of indispensable parties.  *See Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1280 (11th Cir. 2003).

## III.  ANALYSIS

Defendants raise several arguments as to why the Amended Complaint should be

Case No. 11-21992-CIV-ALTONAGA/Simonton

dismissed.  Each is addressed in turn.

A.      Whether the Florida economic loss rule bars Plaintiff's claims

Defendants argue that Florida's economic loss rule bars Plaintiff's second, third, and fourth claims for negligence and negligent misrepresentation, which sound in tort.  (*See* Mot. 3–6).  "The economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 536 (Fla. 2004).  In Florida, the economic loss rule may be applied in two situations.  First, it applies where "the parties are in contractual privity and one party seeks to recover damages in tort for matters arising from the contract." *Id.* at 536.  The economic loss rule also applies where "there is a defect in a product that causes damage to the product but causes no personal injury or damage to other property." *Id.*  Consequently, there are two corresponding exceptions to the application of the rule — where a plaintiff alleges a "tort[] committed independently of the contract breach," *id.*, and where a plaintiff alleges damage to "other property," *id.* at 543.

Defendants contend Plaintiff's claims sounding in tort do not give rise to a cause of action independent of the contract because the alleged misrepresentations are "interwoven and indistinct from the heart of the contractual agreement."  (Mot. 3 (quoting *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So. 2d 74, 78 (Fla. 3d DCA 1997))).  Defendants set forth the same argument to bar Plaintiff's tort claims in the motion to dismiss the original Complaint, which the Court granted in part and denied in part in the September 12 Order.  (*See* Sept. 12 Order 4–11).  The Court found that Plaintiff's claims for negligence and negligent misrepresentation did not allege breaches of a duty independent of the bailment contract(s) between the parties, and thus

8

were subject to the economic loss rule (*see id.* 8–9); however, to the extent Plaintiff alleged

damage to goodwill and "other property" outside the "object of the bargain," the tort claims

would proceed (*id.* 10).  Plaintiff accordingly amended its tort claims to allege only damages to

goodwill and to "other property, namely, at least 260 cases of manufactured bandages, which

were in the possession of Berkeley when they became cross-contaminated with the infested

manufactured bandages."   (Am. Compl. ¶¶ 81–82, 95–96, 106–07; *see also* Resp. 6 ("In

accordance with the September 12 Order, the Amended Complaint's tort claims seek only

damages to goodwill and other property.")).

Apart from the allegations regarding Plaintiff's damages, the facts alleged in the

Amended Complaint remain the same as in the original Complaint for the purpose of the

economic loss rule analysis.  (*See* Resp. 3 (stating that "[t]he Amended Complaint is a verbatim

repetition of the allegations stated in the original Complaint," except for specific modifications

made pursuant to the September 12 Order)).  Defendants raise no new arguments as to why the

Court should rule any differently now than in the September 12 Order.  They do state that the

cases the Court cited in that Order, for the proposition that goodwill is not subject to the

economic loss rule, are inapposite because in those cases "the plaintiff had alleged a separate and

distinct tort claim that was distinguishable from the performance under the contracts at issue, and

. . . the plaintiffs alleged damage to a trademark which is 'other property.'"  (Mot. 5 (citing

*Anthony Distrib., Inc. v. Miller Brewing Co.*, 904 F. Supp. 1363, 1366 (M.D. Fla. 1995); *Mobil

Oil Corp. v. Dade Cnty. Esoil Mgmt. Co.*, 982 F. Supp. 873, 880 (S.D. Fla. 1997))).  Defendants,

however, confound the two exceptions of the economic loss rule and misread these cases, which

establish that it is precisely the allegations of other property damage that render a tort claim

Case No. 11-21992-CIV-ALTONAGA/Simonton

independent of a contractual breach.  *See Anthony Distrib.*, 904 F. Supp. at 1366; *Mobil Oil*, 982 F. Supp. at 880.  The Court therefore finds that Plaintiff's second, third, and fourth claims sounding in tort may proceed, as they allege damage to goodwill and other property outside the subject of the bailment contracts.[2]

Plaintiff, while acknowledging the Court's decision in the September 12 Order, again argues that at least its misrepresentation and omission claims should be deemed entirely independent of the bailment contracts and thus not subject to the economic loss rule to any degree.  (*See* Resp. 8–9).  Plaintiff cites as support *Natarajan v. Paul Revere Life Insurance Co.*, 720 F. Supp. 2d 1321 (M.D. Fla. 2010).  (*See id.* 9).  In *Natarajan*, the defendants allegedly fraudulently induced the plaintiff "to continue paying premiums and purchasing more and more own-occupation disability insurance when Defendants had no intention of honoring the payment provisions of the very policies they were selling."  720 F. Supp. 2d at 1328.  The court found the plaintiff's fraud claims were independent of his breach of contract claim and thus not barred by the economic loss rule.  *See id.* at 1330.  Plaintiff argues by analogy that Defendants' alleged misrepresentation here "encouraged distinct action — a continuation of the bailment relationship — by Gomez, thereby damaging Gomez."  (Resp. 9–10).

The facts in *Natarajan*, however, are distinguishable from those in the instant action. Inducing a party to take the affirmative act of purchasing more insurance is distinctly different from inducing a party to maintain the relations established pursuant to an existing contract. However, to the extent the periodic payment of insurance premiums is indeed akin to the

---

[2]  Defendants argue that Plaintiff neglects to allege its reliance was reasonable with respect to its fourth claim for negligent misrepresentation.  (*See* Reply 4 n.1).  Nevertheless, the Court finds Plaintiff has alleged sufficient facts to infer its reliance on Defendants' alleged omissions was reasonable.

maintenance of a bailment contract (which may involve periodic payments in exchange for a continued service), the Court declines to follow the guidance of the court in *Natarajan* and the rule proposed by Plaintiff.  Otherwise, the well-established distinction between a negligent misrepresentation centering on the performance of a contract, which the economic loss rule bars, and a misrepresentation centered on the bargain to enter the contract, which the rule does not, would be meaningless.  *See Pruco Life Ins. Co. v. Brasner*, No. 10-80804-CIV, 2011 WL 2669651, at *6 (S.D. Fla. July 7, 2011); (September 12 Order 9).  The risk would be that any allegation of negligent misrepresentation would provide talismanic, automatic protection against application of the economic loss rule, something courts have made a point to avoid.  *See id*. Plaintiff's rule would almost require courts to conceive of a contract as a relationship continually renewed at each act performed under it, or even at each moment the parties do not act to rescind it, a concept without foundation in the law.  The simpler approach is to find that Gomez's decision to continue storing its goods at Smith's warehouse was an act of performance under its bailment contracts with Smith.  Any alleged misrepresentations inducing Gomez to continue its storage therefore centered on performance of the contractual terms.  The third and fourth claims of alleged misrepresentations are subject to the economic loss rule and are barred to the extent Plaintiff alleges mere economic damage, which Plaintiff has assured it does not.  Plaintiff's tort claims may therefore proceed, because they allege damages not barred by the economic loss rule.

### B.  Whether Gomez alleges negligent misrepresentation with sufficient specificity

Defendants also seek to dismiss Plaintiff's third and fourth claims for failure to allege negligent misrepresentation with sufficient specificity under Federal Rule of Civil Procedure 9(b).  (*See* Mot. 4).  Defendants state, "the heightened pleading requirements of Rule 9(b) apply

Case No. 11-21992-CIV-ALTONAGA/Simonton

to Gomez's negligent misrepresentation claims.  In the Amended Complaint, Gomez has failed to specify what statements specifically he attributes to Futernick and Smith that could possibly state an independent cause of action under tort law." (*Id*.).  Defendants appear to conflate the requirements of Rule 9(b) with the dictates of the economic loss rule.  In any event, the Court finds Plaintiff has pleaded its allegations of negligent misrepresentation with sufficient specificity pursuant to Rule 9(b).

The heightened pleading requirements of Rule 9(b) are satisfied if the pleading sets forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants "obtained as a consequence of the fraud."

*Brooks*, 116 F.3d at 1371 (quotation omitted).  With respect to Plaintiff's third claim, Plaintiff alleges that on December 13, 2010, and several times thereafter before March 2011, Futernick and Romero of Smith informed Gomez they inspected Smith's warehouse and saw no visible signs of infestation, and that the warehouse was not the source of any infestation. (*See* Am. Compl. ¶¶ 31, 36, 85–87).  Plaintiff provides an excerpt of Futernick's e-mail of December 13, 2010 containing these representations (*see id*. ¶ 31), and Plaintiff explains how it was misled into continuing to store goods with Smith and abstaining from its own independent investigation of the warehouse (*see id*. ¶¶ 37, 93).  Plaintiff alleges Smith made the representations to secure the continued storage of Gomez's goods at its warehouse.  (*See id*. ¶ 90).  Plaintiff has provided sufficient detail to meet the standard of Rule 9(b) with respect to this claim.

Regarding the fourth claim for negligent misrepresentation, Plaintiff alleges that between

12

December 2010 and March 2011, Futernick and Smith neglected to tell Plaintiff the warehouse was infested, after having assured Plaintiff on December 13, 2010 they would conduct an investigation. (*See id.* ¶¶ 99–100). As with the third claim, Plaintiff alleges facts establishing how it was misled by the alleged misrepresentations, and how Defendants benefitted as a consequence. (*See id.* ¶¶ 103–04). Plaintiff's fourth claim is alleged with sufficient specificity to satisfy Rule 9(b).

### C.  Gomez's standing to prosecute Crown's claims

Defendants contend Plaintiff has not alleged "it has authority from Crown to bring claims on the toothbrush material that is owned by Crown," and Plaintiff accordingly lacks standing to bring a claim on behalf of Crown. (Mot. 7). Defendants raised the same argument in the motion to dismiss the Complaint, and the Court rejected it then for Defendants' failure to address Federal Rule 17(a)(1)(F), allowing Plaintiff to bring an action in its own name without joining Crown, when a contract has been made with Plaintiff for Crown's benefit. (*See* Sept. 12 Order 19–20). Plaintiff again alleges facts establishing it entered into bailment contracts for the benefit of itself and Crown. (*See* Am. Compl. ¶¶ 12–14). Defendants again fail to address Rule 17(a)(1)(F), and the Court again declines to dismiss Plaintiff's claims on this basis.[3]

### D.      Whether Gomez failed to join indispensable parties

Defendants further argue Crown is an indispensable party to this suit, and that the portion of the claims pertaining to Crown's property should be dismissed for failure to join Crown. (*See* Mot. 9). The Court rejected this argument in the September 12 Order when Defendants raised it

---

[3]  In their Reply, Defendants finally address Rule 17(a) and engage in a general discussion of the necessity of establishing standing under that rule, yet still fail to address Plaintiff's specific argument that it is entitled to standing under Rule 17(a)(1)(F). (*See* Reply 5–9).

Case No. 11-21992-CIV-ALTONAGA/Simonton

in the first motion to dismiss the Complaint.  (*See* Sept. 12 Order 18–20).  In the September 12 Order, the Court explained courts will deny a motion to dismiss for failure to join indispensable parties where the moving party does not identify a reason the allegedly indispensable party cannot be joined.  (*See id*. 19 (citing *Focus on the Family v. Pinellas Suncoast Trans. Auth.*, 344 F.3d 1263, 1280 (11th Cir. 2003)).  As was the case with the first motion to dismiss, Defendants make no showing why Crown or any other purportedly indispensable party cannot be joined without divesting the Court of jurisdiction.  In fact, Defendants concede the exact opposite in their Reply — Crown is a Delaware limited liability company that would not destroy diversity in this case, and "Crown can and should be joined as a Plaintiff in this litigation."  (Reply 9).[4] Accordingly, the Court does not dismiss Plaintiff's claims on this basis.

## IV.  CONCLUSION

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss Amended Complaint **[ECF No. 44]** is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 14th day of November, 2011.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

---

[4]  That Defendants are out of time to add Crown as a party pursuant to the Scheduling Order [ECF No. 26] does not change the result here.

14